The CiiieF Justice
delivered the following opinion of the court on the petition for a re-hearing:
The petition for a re-hearing sets forth several grounds therefor, which are herein considered.
It alleges among other things, that it is shown that Seymour rented from May twenty-live acres of land, and that before the death of May all the land except live acres had been restored to Mr. May, which five acres is sued for, that no fraud is shown by which Seymour was induced to sign the lease, either by the pleadings or the lease; but that it is shown that Seymour was fully informed of the contents of the lease and signed it voluntarily, and made no complaint that he had been imposed upon.
Tt is inferentially suggested that in the opinion filed, there is an unjust imputation upon the character of Mr. May, now deceased. “We consider it entirely appropriate that the representatives of a deceased person take proper care to guard his memory.
While it cannot be necessary for this court to disclaim any intention to reflect upon the conduct or character of Mr. May, we must insist that a very strong impression was created in our minds by a careful examination of the testimony, that Seymour, because of his ignorance, had been led into an apparent assent to a contract, of the terms and the effect of which he was not informed, and which he repudiated at the very moment of making his mark to it, and which lie had always insisted he would not assent to. Mr. May does not appear to have been present when this was accomplished, and doubtless would have dealt more openly with Seymour, but certain it is, that Mr. May’s agent or agents, whether intending it or not, pressed this ignorant man into a seeming assent, against which his mind and his intention protested.
The petitioners say that it was not claimed at the trial that the burden of proof was upon-the plaintiff to show upon Seymour’s part full knowledge of the contract he was entering into when he signed the lease, and if he had been, plaintiffs would have attempted to strengthen this point with further evidence. What oral argument was made in-the court below we cannot know, but the question ivas fully presented by the record in the instruction, which appellant’s counsel asked the circuit judge to give to the jury; in the instruction which the judge gave to the jury and which was excepted to; in the brief and argument of counsel for Seymour in this court, and in the grounds assigned for error. The third ground in the assignment of • errors by the appellants is this: "3. The. ignorance of the defendant, of the contents of the lease, does not discharge him from its obligations in the absence of fraud or misrepresentation of other unfair conduct upon the part of the lessor, and the charge of the court, which was to that tenor, misled the jury and was erroneous.”
We are, therefore, still of the opinion that the question whether the defendant was bound under the circumstances which led to the making his mark to the paper in question, either with or without actual fraudulent intent on the part of the lessor’s agents, was submitted to this court by the respective counsel.
Petitioners say that the testimony of the defendant as to his conversations with Asa May is not competent evidence under our statute, and should not influence this court. That testimony was referred to in the opinion, it is true, but so far as it related to the conversation with May, it was of not much consequence in view of the testimony of otlier witnesses. Yet that testimony was given to the jury without objection, and having been so given and submitted to the jury, it is very questionable whether it can be objected to here, even if it appears clearly to have influenced the ^ is a well settled rule that in order to avail' himself of an alleged error in the admission of testimony, an exception must hg taken by a party to the ruling of the court in admitting» it, or refusing to strike it out. Very ' little, if anything, was proved by the testimony of the defendant, as to any direct transaction with Mr. May, which was not proved by unquestionable testimony. Most of his testimony related to the circumstances of his tenure, and the occupation of the land, and liis understanding of what the agreement was. The theory of his defence was that he was in rightful possession, as against Asa May, and that he did not hold in subordination to him.
The following is the material portion of the testimony on the part of the complainants: Blackburn testified that he witnessed the signing of the lease. It was drawn up by Mr. Edwards, who kept May’s books. Seymour signed it voluntarily. Edwards said to Seymour, the agreement is ready, and he wanted him to sign it now and close the matter up. Seymour said, “Well, if the land is Mr. May’s I will pay rent for it; if not, I will not;” and then signed it. Seymour is living in the house. On cross-examination witness says the lease was signed at Roach’s blacksmith shop. Seymour has been in possession many years — when Alvin May owned the plantation,' and after Asa May bought it. Heard him speak of it as his place or home. Edwards wrote Stephen Seymour’s name to the lease and Stephen made his mark, touching the pen. Defendant cannot read writing or write his name. ' The lease was not read to him in my presence.
Groom testified, describing the land now occupied by the defendant. As manager of the Asa May place he planted oats there last Year. When he went on the place as May’s *191 superintendent -the hands were planting oats there, and he continued it and planted near to Seymour’s door. Was not disturbed by Seymour. Planted by May’s instructions; did not ask defendant’s permission to plant, and he gave none; did not ask him anything about it. Was instructed by Mr. May to put somebody else into the house, as some of the hands needed it; but Seymour refused to leave, claiming the house as his own. Mr. May died m the spring, and I said nothing more1 to Seymour until recently. S. Pasco, one of the executors, spoke to Seymour about the house last fall; he asked Seymour what he was going to do-about it. Seymour said he did not know, but would go up and see him about it. Witness asked Seymour, since Christmas, •what lie was going to do about it; that he wanted the house. Seymour said if the ease was decided against him he would give it up; if not, he would not. Witness asked Seymour what he signed the lease for if the land was his; and Seymour said that the undei standing was that he was not to pay rent unless the place was Mr. May’s.
On cross-examination witness said that there used to be a cross fence separating the land included in the lease from the rest of the field on that side of the road, but witness had it removed.
S. Pasco, for complainants, testified that last fall, in company with Mr. Croom, the superintendent, he met Stephen Seymour on the public road and asked him if he was not going to give up the house. He acknowledged renting the land from Mr. May, and did not refuse to give up the house; said he would come up and see witness about it. He never came, and witness commenced this suit. On cross-examination, witness, being asked how defendant acknowledged renting the land, said it was in the course of their conversation that the land was spoken of as the land rented from Mr. May, and Seymour did not deny the renting, but said he would come up and see witness about the matter.
This is substantially all the testimony offered by complainants beside the lease. The testimony of the defendant need not be repeated at length here. He testified that he bought the place of Alvin May and paid for it before he (May) was “sold out,” and had been in possession ten or eleven years, living there. After Asa May, Edwards came and repeated Mr. May’s request to sign a “paper for the rent,” and that he told Edwards that the land was in controversy between him and Mr. May; and that if it was Mr. May’s land he would pay rent, but if it was defendant’s land he would not pay any rent; and with this understanding he signed the paper. That he could not read or write, the paper was not read to him, and he did not know what was in it when he signed it. He says, also, that though he • gave every opportunity by pointing out his property, no attempt was made by Mr. May, or his representatives, to .enforce the collection of the rent.
We think all the testimony bears upon the questions of the validity of the lease; whether Seymour was or became a tenant of May; whether the leasq was the agreement or expression of the mind of Seymour; whether, while always insisting that the land and house were his own, bought and paid for ten years before, he did voluntarily intend to surrender to one whose right he constantly disputed.
The testimony of Blackburn and Croom clearly settle these questions. Instead of this land having “been restored to the actual possession” of Mr. May by defendant, as alleged in this petition, complainants prove by Croom that lie took possession of the land, removed fences, plowed and planted by May’s instructions up to Seymour’s door without saying anything to him about it, and “Seymour did not disturb him.” It is clearly shown that when the lease was produced, already signed by May, Edwards said to Seyomur, the “agreement is ready” and wanted him to “sign it now and close the matter up.” It was not called a lease, but an “agreement.” What agreement? Seymour had always 'professed readiness to pay rent if the land belonged to Asa May, but if it was his own, he would not pay rent. There was a controversy existing about their respective rights. Seymour, in the act of making his mark to the paper, expressed what he understood the "agreement” to be. He had been told .it was an agreement “about rent.” He was willing to enter into an agreement about rent, and he repeatedly indicated what kind of an agreement it should be. The tenor of the whole evidence shows it, and shows what he supposed he was assenting to.
It is no answer to say that this phase of the case was not much argued before the court. The question was presented by the exceptions, the argument of Seymour’s counsel, and his written brief, and by the assignment of errors flatly; and it would be a denial of common intelligence to say that this is not the material question, and one that first and last enlists the attention in reading the record of this case. Nowhere does it appear that Seymour acknowledged this lease as his agreement, or that he was a tenant upon this land. Mr. Pasco says Seymour “acknowledged the renting” of the land from Mr. May, arid “did not refuse to give up the house but promised to go up and see about it.” The cross-examination shows that the “acknowledgment” was, that in the course of the conversation “the land was spoken of as land rented from Mr. May, and Seymour did not deny the renting,” but said he would “come up and see about it.”
With a person of ordinary education and'intelligence this might be treated as a circumstance showing that a tenant acknowledged his tenancy. Seymour’s tenure had been called a “renting” in the efforts to induce him to leave, (and it is well shown what kind of renting lie had assented to,) and in dealing with a person of his mental caliber, and being addressed by a person of intelligence and of different social position, it cannot fairly be exacted of him that he shall be deemed to assent, particularly when instead of assenting he evades discussion, aand postpones the subject by promising to “come up and see about it.”
Previous to the signing of the lease nothing was said to defendant about his becoming a “tenant” to May or paying rent that did not bring from' him the response that he would agree “to pay rent if the land was May’s,” and when told that the “agreement” was now ready and the matter must be closed up, he repeated what his understanding of the agreement was, and his understanding was not corrected by the agents of Mr. May then and there.
Under the circumstances can it be candidly pretended that Seymour did “with his eyes open,” without apparent consideration, without apparent benefit to himself, but on the contrary, to his probable detriment, enter into an agreement whereby he surrendered his supposed right to his land and home, while in the same breath he declares he will not and does not intend any such thing, unless he shall be satisfied that Mr. May has the better right? The question tried was not one of title, but whether Seymour had within three years held wrongful possession of the property against the consent of the plaintiff entitled to it. All the evidence was pertinent to or bore upon this issue, and the jury considered it; it all bears upon the question whether the lease is the contract of the defendant. Contracts are binding according to the mental comprehension and capacity of the contracting parties. “Where one places reliance upon another, the one trusted shall not take advantage of such confidence to the prejudice of the other.” New vs. Wambach, 42 Ind., 456; 65 Barb., 346.
In Foster vs. McKinnon, 4 Law R., (Common Pleas,) 704, (cited in Gibbs vs. Linabury, 22 Mich., 479-486,) a witness, Callow, who was acceptor of a bill, had produced the bill to the defendant, who- was advanced in life, for him to put *192 his signature on the bade after that of one Cooper, the payee and first endorser, Callow not saying it was a bill, and telling the defendant that the instrument was a guarantee. Defendant did not see the face of the bill at all. But it-was of the usual shape and bore a stamp, the impress of which was visible at the back of the bill. Callow also testified that the defendant, believing that the .document was only a guarantee, then signed his name after Cooper’s. The court say: "It is invalid, not merely on the ground of fraud, but on the ground that the mind of the signer did not accompany the signature. In other words, that he never intended to sign, and therefore, in contemplation of law, never did sign the contract to which his name was appended. * * * In the case now under consideration the defendant, according to the evidence, if believed, and the finding of the jury, never intended to indorse a bill of exchange at all, but intended to sign a contract of an entirely different nature. It was not his design, and if he was guilty of no negligence, it was not even his fault that the instrument he signed turned out to be bill of exchange.”
In Selden vs. Myers, et al., 20 Howard, U. S., 506, 509, Chief Justice Taney delivering the opinion of the court, says: “It is true that Selden is an unlettered man, and can neither read nor write. He makes his mark to the instruments lie executed, and dealing with such a person, it is incumbent on Myers & Co. to show, past -doubt, that he fully undersioodtheobject andim.portof thewritings uponwhichthe-y are proceeding to charge him, and if they had faijed to do so the above mentioned testimony, offered by the appellant, as to the state of the accounts between them at the time, would have furnished strong grounds for inferring that he had been deceived, and had not understood the meaning of the ■written instruments he signed
The reasoning of Judge Taney disposes of the question of negligence on the party*of Seymour in not requiring the lease to be read to him before signing it. It was the duty of the persons of superior intelligence, who were dealing with him, to inform him fully, and a man so ignorant as Seymour is shown to be is not chargeable with negligence when dealing with persons who admit they were well aware of his want of intelligence. It is not necessary in this case to charge that Mr. May or his agents intended to deceive or defraud Seymour; the contract wants validity, as stated in Foster vs. McKinnon, “becausce the mind of the signer did not' aecomapny the signature.”
In view of this rule, so emphatically endorsed by Chief Justice Taney and the Supreme Court of the United States, the Circuit Judge very properly refused to giv,e the instruction asked for by the plaintiffs’ counsel, considering the capacity and degree of intelligence manifest to the court of this defendant; and the rule laid down goes very far toward sustaining the charge given by the court, to which the, complainants excepted. Considering the whole case, upon the law and the facts as they appear here, the proper tribunal to which the rights of these parties should be referred is one which is empowered to try the title to the property involved. The method adopted by Mr. May’s agents, of determining the rights of the defendant, does not seem to be the proper one.
"We are well satisfied that under the charge prayed for by complainants, if it had been given by the court, the jury could not, upon 'the evidence, .have found that this lease was the agreement of the defendant, or that he acquiesced in it in any manner after it was signed. We think further, that under any charge that might have been given, upon the facts as presented here, a verdict for the defendant must have been sustained; and this, without in the least reflecting upon the good name of Mr. Asa May.
The rehearing is refused.